# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BANK OF AMERICA, NATIONAL ASSOCIATION, as successor by merger to LASALLE BANK NATIONAL ASSOCIATION, ) ) ) ) ) | |
| ) | Case No: 12 C 9612 |
| Plaintiff, ) | |
| ) | |
| v. ) | District Judge John Z. Lee |
| ) | |
| ) | Magistrate Judge Susan E. Cox |
| LASALLE COMMERCIAL MORTGAGE SECURITIES, INC., SERIES 2006-MF4 TRUST, acting by and through its Master and Special Servicer, MIDLAND LOAN SERVICES, a division of PNC Bank, National Association and whose Trustee is WELLS FARGO BANK, N.A.., ) ) ) ) ) ) ) ) | |
| ) | |
| Defendants. ) | |
| ) | |

| | |
|---|---|
| LASALLE COMMERCIAL MORTGAGE SECURITIES, INC., SERIES 2006-MF4 TRUST, acting by and through its Master And Special Servicer, MIDLAND LOAN SERVICES, a division of PNC Bank, National Association, and whose Trustee is WELLS FARGO BANK, N.A., ) ) ) ) ) ) ) | Case No: 13 C 5605 District Judge John Z. Lee Magistrate Judge Susan E. Cox |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) ) | (Consolidated with Case No. 12 C 09612 for Purposes of Discovery) |
| ) | |
| BANK OF AMERICA, NATIONAL ASSOCIATION, as successor in interest to LaSalle Bank National Association, ) ) ) | |
| ) | |
| Defendant. ) | |

## ORDER

Before the Court is Bank of America's motion to compel responses to Subpoena *Duces Tecum* and Subpoenas *Ad Testificandum* by non-party Spring Hill Capital Partners, LLC [dkts. 113 and 121]. The Court finds the theories advanced by Bank of America to enforce these subpoenas are not persuasive and, therefore, sustains the objections to them by Spring Hill. Bank of America's motion is hereby denied.

## STATEMENT

The two cases which give rise to the instant motion arise out of a dispute concerning the sale and securitization of mortgage loans. The movant, Bank of America "(BOA")", is the successor in interest to LaSalle Bank National Association ("LaSalle"), which is alleged to have breached various representations and warranties contained in a Mortgage Loan Purchase Agreement ("MLPA"). Under this agreement, executed in December 2006, LaSalle Bank agreed to sell a pool of residential mortgages loans to LaSalle Commercial Mortgage Securities ("LaSalle Commercial'). These parties, along with Midland Loan Services ("Midland"), as the Master Servicer for these loans, and Wells Fargo Bank, as Trustee of the LaSalle Commercial Mortgage Trust 2006-MF4 (the "Trust"), had entered into a separate Pooling and Servicing Agreement ("PSA"). In that agreement the mortgage loans were transferred to the Trust, which then issued certificates to investors, thereby securitizing the mortgage loans.

Whether BOA breached its warranties and representations in 2006 (when the transaction closed) is at the heart of the two pending actions: one, an action by BOA that it did not, in fact, do so, and one by Midland, in its capacity as Master Servicer, in which it claims BOA breached the MLPA and demands that BOA repurchase all of the loans. (This Second Amended Complaint is the subject of a pending motion to dismiss.)

About two months before the close of discovery in this case, BOA served several subpoenas on Spring Hill Capital Partners, LLC. Although a non-party to the actions, Spring Hill is not a stranger to this litigation. Spring Hill is the only certificate holder for the loans in question and, unlike Midland who is the named plaintiff by virtue of its role as Master Servicer for the Trust, Spring Hill is the party who will benefit if a material breach of the MLPA is established and BOA has to repurchase the loans. Not surprisingly, then, Spring Hill, which acquired its interest in the certificates in 2011, has closely monitored the instant litigation and undoubtedly communicated with the plaintiff, Midland. (However, communications between these two entities about the allegations of this lawsuit are *not* at issue in this motion.)

It is Spring Hill's objection to the subpoenas that forms the basis of this dispute. BOA has served three subpoenas *ad testificandum* and one subpoena *duces tecum*. After a round of negotiation, BOA has narrowed the time frame of the subpoena to January 1, 2011 to the present. The subject matters it seeks include non-privileged testimony/documents and internal communications/analyses and its communications with parties *other than Midland* regarding:

1.      the quality or value of the MF4 Loans or Mortgaged Properties;
2.      La Salle's origination, underwriting, appraisal, and/or closing practices generally or with respect to MF4 Loans;
3.      sending the Repurchase Demand or commencing the Repurchase Action;
4.      allegations in the Repurchase Demand or Repurchase Action Complaint supporting the alleged breaches of the representations and warranties in the MLPA;
5.      Spring Hill's interpretation of the RW's in the MLPA and the repurchase provisions of the PSA and MLPA;
6.      the prices at which Spring Hill acquired, or the amounts paid by Spring Hill to acquire, the MF4 Certificates;
7.      Spring Hill's investigation, evaluation, analysis or due diligence with respect to its investment in the MF Certificates; and
8.      Spring Hill's evaluation of its actual or potential profits or losses in connection with its investment in MF4 Certificates.

Spring Hill objects to producing any of this information, although it is apparently willing to produce those documents that it reviewed prior to investing in the MF4 certificates and documents it reviewed as part of its "investment surveillance." The basis for the objection is that the subpoenas place an undue burden on Spring Hill to comply because the information sought has little to no relevance to the claims asserted in this case. Spring Hill argues that its decision to invest in this transaction in 2011, as well as any of its internal analysis about the underlying loans either before or after they purchased the securities, do not bear on the allegations Midland has made in the Complaint, which charge that LaSalle breached several warranties and representations back in 2006 when it pooled these particular mortgage loans and sold them to LaSalle Commercial. LaSalle Commercial then, in turn, transferred them to the Trust, which securitized the investment by issuing certificates now held by Spring Hill. Spring Hill contends that its analysis of its investment does not inform on the question of whether there was a breach at the time the transaction closed, which it contends is the time frame relevant to the analysis. Accordingly, it argues that the subpoenas place an undue burden on it to comply.[1]

The Federal Rules of Civil Procedure provide that parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."[2] Relevance is not confined to evidence that is admissible, but allows discovery if it is "reasonably calculated to lead to the discovery of admissible evidence.[3] Although this definition is expansive, it has its limits. As the Comments to the Rules state, Rule 26 allows the court to "confine discovery to the claims and defenses in the pleadings, and signals to the parties that they have no entitlement to discovery to

---

[1] Although the instant motion is styled as a motion to compel, it is actually a motion to enforce a subpoena issued under Rule 45 of the Federal Rules of Civil Procedure. Accordingly, the Court will construe Spring Hill's objection as a motion to quash the subpoenas in question.

[2] Fed. R. Civ. P. 26(b)(1).

[3] *Id.*

develop new claims or defenses that are not already identified in the pleadings."[4] Thus, a court can limit discovery to those matters raised in the pleadings.[5]

But this dispute also is governed by Rule 45 because, regardless of its status as an investor here, Spring Hill is indisputably a non-party. As many courts have held, that non-party status is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue.[6] Thus, in determining whether the recipient of a subpoena is being subjected to "undue burden," the court considers a number of factors, including "the person's status as a non-party, the relevance of the discovery sought, the subpoenaing party's need for the documents, the breadth of the request, and the burden imposed on the subpoena."[7]

In this case, although Spring Hill also contends that the documents would be difficult for it to access and would reveal proprietary information, its primary argument is that the information is irrelevant because the issue of whether LaSalle breached representations and warranties will be determined at the time of securitization (2006) and not when it acquired its investment in the certificate (2011).[8] BOA does not dispute that the time frame to determine whether a breach occurred under New York law is when the loans were securitized. Nonetheless, it offers a number of theories as to why Spring Hill's internal documents are relevant. BOA first argues "post-closing" information is relevant because the district judge here ordered Midland to produce its post-closing loan servicing guidelines. But we do not read the ruling to say this. The narrow issue before District Judge Lee in that discovery dispute was whether there was a basis under the PSA for BOA to contend that Midland failed to mitigate its damages. Midland claimed that the

---

[4] Fed. R. Civ. P. 26 (b), 2000 Amendment Committee's Notes.
[5] *Murata Mg. Co., Ltd. v. Bet Fuse,* 442 F.Supp.2d 934, 944-45 (N.D. Ill. 2006).
[6] *See, e.g., Robinson v. Morgan Stanley,* No. 06 C 5158, 2010 WL 1005736 at *2-3 (N.D. Ill. March 17, 2011).
[7] *Parker v. Four Seasons Hotel, Ltd.,* 291 F.R.D. 181, 188 (N.D. Ill.2013), *quoting last Atlantis Capital, LLC v. AGS Specialist Partners,* No. 04 C 0397, O5 C 5600, 05 C 5671, 2013 WL 182792 at *1 (N.D. Ill. Jan, 17, 2013).
[8] *See, e.g., Assured Guar. Mun. Corp. v. Flagstar Bank, FSB,* 920 F.Supp.2d 475 509 (S.D.N.Y. 2013); *see also,Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 10 Civ. 9584 (JPO), 2013 WL 1285289, at *10-11 (S.D.N.Y. Mar. 28, 2013).

Purchase Price remedy provided for in the PSA did not allow for a reduction based on proof that Midland failed to service the loans in question consistent with its own obligations in the PSA. The Court found that because Midland's potential failure to service the loans as required by the PSA could negatively impact the value of Purchase Price, its servicing of the loans in question was relevant to the issue of damages. As the Court noted, "the timing of a purported breach is distinct from the magnitude of damages that Bank of American would have to pay, once a breach is proven." This ruling, therefore, allows BOA to discover post-closing information from Midland regarding its failure to mitigate damages as a loan servicer, but does not shed any light on whether an investor, which obtained the loan certificates five years after the agreements were executed (and when the alleged breach occurred), should produce documents concerning its analysis and monitoring of the investment in question.

Of course, as BOA points out, courts frequently find a basis to permit post-closing discovery between parties in a breach of contract suit and the Court agrees that a temporal line in the sand is not appropriate if the discovery sought is likely to lead to admissible evidence. But none of the cases cited by BOA in support of this very basic proposition create a basis for a finding that the particular evidence it seeks here is relevant. In *Cerabio LLC v. Wright Medical Technology*, the Seventh Circuit held that the pre-closing discussion between the parties to the underlying contract at issue was relevant to the issue of what constituted a reasonable time for contract and that post-closing conversations could be admitted to show the agreement had been modified.[9] Spring Hill is neither a party to any of the agreements here nor have these defenses been raised here. *Shields Enterprises v. First Chicago Corporation*, another case cited by BOA, is also clearly distinguishable.[10] The former minority shareholder in a company (CBSI), which sold

---

[9] 410 F.3d 981 (7th Cir. 2004).
[10] No. 86 C 10213, 1988 WL 142200 (N.D. Ill. Dec 28, 1988).

computerized billing services for cellular telephone systems, sued the majority shareholders alleging that they coerced him to sell his stock in CBSI at a grossly undervalued price when CBSI was sold to Cincinnati Bell.[11] Documents relating to a third party cellular telephone billing service also acquired by Bell were deemed relevant because that third party company's value was used as a benchmark when CBSI's value was assessed.[12] Thus, even though Bell purchased the third party after the transaction at issue in the litigation, the worth of that entity was an issue in the case. By contrast, any valuation of Spring Hill's own investment in the certificate five years after closing has nothing to do with whether the alleged warranties and representations were breached at closing or the value of the certificates at closing.

BOA makes a variety of different arguments about the relevance of this information. The first, and superficially the most appealing, is that Spring Hill's potential knowledge of the alleged breach and failure to give prompt notice as defined by the operative agreement might support BOA's potential defense in this case. Indeed, the cases cited by BOA state that documents relevant to this defense are discoverable in a repurchase case when the issue of prompt notice is raised as a defense. The cases it cites clearly hold that such post-closing analyses are relevant when done by a party to the agreement or its agent.[13] The Court would have no difficulty finding that Midland's own analyses might be relevant here. But Spring Hill has not brought this action. Assuming that there is information in Spring Hill's possession relevant to this defense, such information could not be asserted as a defense against Midland unless Midland had knowledge of it. This Court assumes that BOA has not been prevented from thoroughly exploring this topic with Midland, including

---

[11] *Shields Enterprises,* No. 86 C 10213, 1988 WL 142200 at *1.

[12] *Id.* at 4.

[13]*See Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Morgan Stanley Mortg. Cap., Inc.,* No. 11 C 0505, 2013 WL 3146824 at 22 (S.D.N.Y., June 19, 2013)(reopening discovery to allow the plaintiff trustee to disclose communications that touched on the subject of defendant's alleged breach); *see also Mastr. Adjustable Rate Mortgs, Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.,* 2014 WL 25709 (S.D.N.Y., Jan. 2, 2014)(requiring the defendant to produce certain post-closing documents because they were created pursuant to the defendant's contractual duty to review the loans).

obtaining documents in its possession from Spring Hill which discuss these issues with Midland. Moreover, the Notice provision in the PSA relied upon by BOA (2.03 (b)) for this defense explicitly states that the failure to give such notice does not relieve BOA of its obligations to repurchase under the MLPA. "Notwithstanding anything contained in this Agreement or the Mortgage Loan Purchase Agreement, no delay in either the discovery a Defect or Breach or delay on the part of any party to this Agreement in providing notice of such Defect or Breach shall relieve the Mortgage Loan Seller of its obligation to repurchase if it is otherwise required to do so under the Mortgage Loan Purchase Agreement and/or this Agreement."[14]

The second argument which BOA makes is that Spring Hill's assessments of and communications concerning the loans and LaSalle's underwriting practices in general are relevant to the issue of whether in fact they met "industry standards" or are consistent with the custom and practice in the industry. But the issue framed in the Second Amended Complaint is not whether LaSalle's loan programs met "industry standards" but, whether, at the time that the securitization occurred, LaSalle breached specific representations and warranties. Spring Hill's analyses/monitoring of its own investment five years later do not inform on this question. And the cases that BOA cites in support of this argument are clearly distinguishable from the case at bar.[15]

The same can be said of BOA's third contention which is that it is entitled to know what Spring Hill believes different terms in the agreements mean. BOA does not cite a specific section of the operative agreements, which it contends are ambiguous and about which discovery

---

[14]Pooling and Servicing Agreement §2.03 (b), BOA Mt. to Compel, dkt. 113-5.
[15]*Abrams v. Van Kampen Funds, Inc.,* No. 01 C 7538, 2005 WL 88973 at *21 (N.D. Ill., Jan. 13, 2005) (addressing motions in limine in a securities fraud action, where defendant sought to exclude from evidence criticism of its valuation procedures done by the SEC, the regulatory agency charged with monitoring the defendant); *see also Preis v. New Eng. Life Ins. Co.,* No. 07 C 582, 2009 WL 1530994 (W.D. LA, May 28, 2009)(evaluating an affidavit in support of a motion for summary judgment from plaintiff's insurance broker regarding the insurance company's intent to honor the original underwriting commitment based on his history of working with the company); *see also Western Ind., Inc. v. Newcor Canada Ltd.,* 739 F.2d 1198 (7th Cir. 1984)(discussing trial evidence – whether to exclude testimony – regarding trade custom in the welding business).

concerning these terms' meaning is necessary. But, accepting at face value that there will be disputed contractual provisions, the notion that this entitles BOA to obtain discovery from a third party that acquired the certificates several years after the documents were executed, rather than from the parties that negotiated and closed this transaction, does not make sense. Spring Hill's post-closing opinions of what the agreements mean are no more relevant about what they actually mean than those of any other potential investor or other player in the securitization game. Further, its reasons for acquiring this investment and its opinions of its performance are not likely to lead to admissible evidence about whether, five years earlier, BOA breached its warranties and representations when these loans were securitized. BOA has not cited a single case in which a party was permitted to seek this kind of lay opinion evidence from a non-party by way of subpoena.

Nor are Spring Hill's opinions of the allegations made by Midland in the Second Amended Complaint - or its view of Midland's decision to seek the Repurchase Demand - likely to lead to admissible evidence which will prove or disprove those allegations or whether, as BOA contends, Midland's Repurchase Demand was inadequate. (BOA does not articulate this purported defense other than to mention it in passing in its reply brief.) To the extent that Spring Hill communicated its views on either subject to Midland (and Midland was influenced thereby), those communications already have been explored in party discovery from Midland.

Finally, BOA makes a very general argument that the discovery is relevant to "impeachment." BOA claims that it is entitled to know whether Spring Hill's opinions and views about this transaction differ from Midland's. Regarding the first contention, assuming that Spring Hill's internal analyses about the case differ from Midland's, that contrary view does not impugn Midland's credibility unless Midland knew that view, agreed with it and filed the lawsuit anyway.

In that case, documents and testimony obtained from Midland would reveal this. Spring Hill's credibility as the investor five years after the alleged breach of warranties occurred is not at issue in this case. BOA has not suggested that Midland possessed an improper motive for the lawsuit.[16]

In conclusion, the theories advanced by BOA to enforce these subpoenas are not persuasive and the Court sustains the objections to them by Spring Hill. The Court notes, however, that an answer and affirmative defenses to the Second Amended Complaint have not been filed. That pleading may give rise to additional bases for relevance not currently before the Court.

**ENTER:**

**DATED:** <u>August 12, 2014</u>                                   /s/  Susan E. Cox_____
                                                                                        Susan E. Cox
                                                                                        United States Magistrate Judge

---

[16] In the only case cited by BOA in support of a subpoena aimed at obtaining information about the motive of the law suit from a third party, the defendants specifically alleged that the plaintiffs had brought the action in bad faith to revoke defendants charter to form a new union conference, which would benefit the third parties to whom the subpoenas were directed. *See Int'l Brotherhood of Teamster v. Eastern  Conf. of  Teamsters et al.,*  162 F.R.D. 25 (S.D.N.Y. 1995).  There is no such contention here. BOA has not articulated any specific reason to believe this action was brought in bad faith or motivated by Spring Hill's bad faith.